# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 22-1941V

|  |  |
|---|---|
| PRISCA THOMAS,<br><br>　　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: March 7, 2025 |

*Jeffrey S. Pop, Jeffrey S. Pop & Associates, Beverly Hills, CA,* for Petitioner.

*Jamica Marie Littles, U.S. Department of Justice, Washington, DC,* for Respondent.

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On December 30, 2022, Prisca Thomas filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that she suffered a Shoulder Injury Related to Vaccine Administration ("SIRVA") as a result of a Tdap vaccine administered to her on April 22, 2020. Petition, ECF No. 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

For the reasons described below, and after holding a brief hearing on entitlement and damages in this matter, I find that Petitioner is entitled compensation, and I award damages in the total amount of **$85,085.00, representing Petitioner's actual pain and suffering and past unreimbursed expenses.**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

I.      **Relevant Procedural History**

As noted above, this case was initiated in December 2022. The parties initially engaged in settlement discussions but were unable to informally resolve this claim. On August 2, 2024, Respondent filed his Rule 4(c) Report arguing the claim should be dismissed. ECF No. 22. I thereafter set deadlines for the filing of briefs addressing both Petitioner's entitlement to compensation and an appropriate award of compensation (if Petitioner established entitlement). ECF No. 23.

On September 23, 2024, Petitioner filed a Brief Regarding Entitlement and Damages, arguing that she had established entitlement to compensation for her SIRVA injury, and requesting an award of $95,000.00 for past pain and suffering, plus $2,085.00 for past unreimbursed expenses. ECF No. 27. Respondent reacted to the filing on November 6, 2024, recommending that entitlement to compensation be denied under the terms of the Vaccine Act. ECF No. 29. Respondent further argued that in the event entitlement to compensation was found, Petitioner should be awarded the lesser amount of $16,600.00 for actual pain and suffering, but had to objection to an award of $2,085.00 in unreimbursed expenses. *Id.*

Petitioner filed a Reply on December 13, 2024, and I subsequently scheduled this matter for a "Motions' Day" expedited hearing. ECF No. 31; Hearing Order (Non-PDF) filed January 29, 2025. The Motions' Day hearing took place on February 28, 2025. Minute Entry dated February 28, 2025.[3] After hearing argument, I orally ruled on Petitioner's entitlement to compensation, and after hearing further argument made an oral damages determination as well. This Decision memorializes those findings/determinations.

II.     **Factual Findings and Ruling on Entitlement**

   A.  **Legal Standards**

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding his claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

---

[3] Alexandra Pop appeared on behalf of Petitioner, and Jamica Littles appeared on behalf of Respondent. The transcript of the February 28, 2025 Hearing in this case was not filed as of the date of this Decision, but my oral ruling is incorporated by reference herein.

2

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *See Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Hum. Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Hum. Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[4] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a Tdap vaccine. 42 C.F.R. § 100.3(a)(II)(C). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support

---

[4] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

### B. Factual Findings

#### 1. Onset

The primary Table requirement for SIRVA that Respondent contests is whether Petitioner's first post-vaccination symptom or manifestation of onset (specifically pain) occurred within 48 hours of his vaccination, as set forth in the Vaccine Injury Table and Qualifications and Aids to Interpretation ("QAI") for a Table SIRVA. 42 C.F.R. § 100.3(a)(II)(C) (pertussis vaccines); 42 C.F.R. § 100.3(c)(10)(ii) (required onset for pain listed in the QAI); ECF No. 22 at 8-10; ECF No. 29 at 10-12. Based upon a review of the entire record, and for the reasons set forth below, I find that it more likely than not was.

Petitioner received a Tdap vaccine in her left deltoid on April 22, 2020. Ex. 2. Petitioner's first few medical visits after her vaccination do not document a complaint of left shoulder pain. However, these visits concerned the imminent, and then actual, delivery of Petitioner's daughter on May 21, 2020, and the subsequent post-delivery complications she experienced in May and June 2020. Ex. 3 at 9,12-32, 47; Ex. 4 at 9, 12, 14, 21. On July 2, 2020 (just over two months after her vaccination), Petitioner was seen by John A. Swanson, MD, her Ob-Gyn, for a six-week post-partum follow-up

appointment. Ex. 4 at 22. Dr. Swanson's record states that Petitioner "does continue to complain of [her] left arm being sore from her Tdap injection on April 23rd."[5] *Id.*

Subsequently, on September 28, 2020, Petitioner sought treatment from her primary care physician ("PCP") for left shoulder pain. Petitioner reported to her PCP that her pain began "after [her] [T]dap vaccination 6 months ago." Ex. 7 at 96-97. She reported that she was unable to sleep on her shoulder, and that her pain was "affecting [her] ability to carry [her] baby." *Id.* at 97. An ultrasound was conducted that day and found "subdeltoid bursa inflammation." *Id.* Petitioner was diagnosed with pain and bursitis in the left shoulder and given a steroid injection. *Id.* at 98. Petitioner was seen for her shoulder pain again by her PCP on January 14, 2021. Ex. 7 at 75-76. Her PCP noted that this was her "2nd episode in 8 months c/w subdeltoid bursitis. This originally occurred after vaccine was given months ago." Ex. 7 at 76. Petitioner's PCP referred for an MRI, conducted another ultrasound which again demonstrated bursitis and administered another steroid injection to treat Petitioner's shoulder. *Id.* at 76-77. Thereafter, Petitioner continued to seek treatment for her shoulder fairly consistently through August 2021, and more intermittently through December 2023. *See* Ex. 7 at 4-5, 33-34, 37-39; Ex. 19 at 13-14; Ex. 20 at 1; Ex. 22 at 13-14.

The medical records cited above (Ex. 4 at 22, Ex. 7 at 76-77, 96-98) as supported by Petitioner's sworn statements from herself, her husband (Ex. 1; Ex. 15) and her text messages (Ex. 6)[6], preponderately support the conclusion that the onset of her shoulder pain likely began within 48 hours of her vaccination. I credit Respondent's arguments about the vagueness of certain records pertaining to onset in this case, but note that the Program's evidentiary standards are still satisfied by the evidence. As I have previously observed, "the Vaccine Act clearly does *not* require that symptoms be recorded within a specific timeframe to be preponderantly established. Rather, it requires only that onset *occurs* in the relevant timeframe." *Niemi v. Sec'y of Health & Hum. Servs.,* No. 19-1535V, 2021 WL 4146940, at *4 (Fed. Cl. Aug. 10, 2021) (citing Section 13) (emphasis in original). Neither does the Act require that the medical records document an exact date that the onset of a petitioner's shoulder pain began. A special master may thus find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2).

---

[5] This appears to be a typographical error as Petitioner received her vaccination on April 22, 2020. Ex. 2.

[6] Petitioner submitted documentation of text messages from June 26, 2020 wherein she stated, "I got the tdap shot when I was 37 weeks (last week of April) and my shoulder is still sore from it and it's been like 8 weeks …is that normal?" Ex. 6; Ex. 1.

### 2. Limited Range of Motion

Respondent also offered (in a somewhat off-handed manner) an additional objection to entitlement: that Petitioner cannot establish that she ever suffered limited range of motion.[7] As an initial matter I observe that I have previously held, after examining 42 C.F.R. § 100.3(c)(10), that the QAI definition for a SIRVA injury requires that a petitioner demonstrate they suffered *both* pain and limited or reduced range of motion following receipt of a covered vaccine. *See Bolick v. Sec'y of Health & Hum. Servs*., No. 20-893V, 2023 WL 8187307, at *7-8 (Fed. Cl. Spec. Mstr. Oct. 19, 2023). However, I have also held that there is no associated time requirement within which a petitioner must manifest reduced range of motion, or how much such limitations must be established. *Id; see also Dawson v. Sec'y of Health & Hum. Servs*., No. 19-278V, 2021 WL 5774655, at *4 (Fed. Cl. Spec. Mstr. Nov. 4, 2021)("no time period is set forth in which Petitioner must manifest reduced range of motion").

In the instant case, the record contains sufficient objective and subjective evidence that Petitioner suffered limited range of motion to find this element satisfied. The first objective evidence that Petitioner suffered limited range of motion is from her February 8, 2021 MRI report, obtained approximately nine and a half months following her vaccination. Ex. 8 at 6. The "clinical data" section of the report states, "left shoulder pain, *limited range of motion*. Rotator tear versus foreign body. Pain since flu shot in left shoulder in 04/2020. No surgery, no injury." *Id.* (emphasis added).[8] Additionally, nearly fourteen months after her vaccination, on June 21, 2021, Petitioner exhibited reduced range of motion on examination by orthopedic specialist Jonathan Crosby, PA-C. Ex. 10 at 7-8. Accordingly, I find that Petitioner demonstrated reduced range of motion in her left shoulder and thus satisfied the third QAI requirement for a SIRVA Table injury. 42 C.F.R. § 100.3(c)(10)(iii).[9]

---

[7] This objection was mentioned in passing only in Respondent's brief, and not at all in his Rule 4 (c) Report. However, Respondent made clear at the oral argument in this claim that it is his position that Petitioner has not established this QAI requirement for a SIRVA Table claim. Thus, it is addressed.

[8] It is true, as Respondent argued at the Motions Day hearing, that the MRI report was not itself a "measure" of range of motion. However, this does not defeat a finding of range of motion limitations, since it is still evidence of that. 42 C.F.R. § 100.3(c)(10)(iii). *See Dawson v. Sec'y of Health & Hum. Servs*., No. 19-278V, 2021 WL 5774655, at *2-3 (Fed. Cl. Spec. Mstr. Nov. 4, 2021). (Finding reduced range of motion in another SIRVA, as "[f]urther, objective evidence is found in Petitioner's MRI order and report, both of which document that Petitioner required a left shoulder MRI due to his left shoulder pain and decreased range of motion"). I would differentiate this from a finding of *pain* on motion, which is not similarly evidence of reduced range of motion by itself.

[9] However, as discussed subsequently, the delayed objective presentation of reduced range of motion in this case suggests a lesser severity of injury than exhibited in some cases, and thus merits consideration in my pain and suffering award.

### C. Other Requirements for Entitlement

Based on the above, Petitioner has satisfied all requirements for a Table SIRVA. However, even if a petitioner has satisfied the requirements of a Table injury or established causation-in-fact, he or she must also provide preponderant evidence of the additional requirements of Section 11(c), *i.e.,* receipt of a covered vaccine, residual effects of injury lasting six months, etc. *See generally* § 11(c)(1)(A)(B)(D)(E). But those elements are established or undisputed in this claim. I therefore find that Petitioner is entitled to compensation in this case.

## III. Damages

### A. Legal Standards for Damages Awards

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is

7

nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a Court of Federal Claims decision several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 595. Under this approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards – and properly emphasizes the importance in each case of basing damages on the specific injured party's circumstances.

### B. Prior SIRVA Compensation Within SPU[10]

#### 1. Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2025, 4,545 SPU SIRVA cases have resolved since the inception of SPU ten years before. Compensation has been awarded in the vast majority of cases (4,397), with the remaining 148 cases dismissed.

2,506 of the compensated SPU SIRVA cases were the result of a ruling that the petitioner was entitled to compensation (as opposed to an informal settlement), and therefore reflect full compensation.[11] In only 270 of these cases, however, was the

---

[10] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[11] The remaining 1,891 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded.

8

amount of damages determined by a special master in a reasoned decision.[12] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[13]

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[14] Agreement** |
|---|---|---|---|---|
| **Total Cases** | 270 | 2,206 | 30 | 1,891 |
| **Lowest** | $30,000.00 | $5,000.00 | $45,000.00 | $1,500.00 |
| **1st Quartile** | $67,305.16 | $60,000.00 | $90,000.00 | $32,500.00 |
| **Median** | **$89,500.00** | **$80,000.00** | **$122,866.42** | **$50,000.00** |
| **3rd Quartile** | $125,000.00 | $107,987.07 | $162,000.60 | $75,000.00 |
| **Largest** | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### 2. Pain and Suffering Awards in Reasoned Decisions

In the 270 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $30,000.00 to $215,000.00, with $87,000.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from

---

Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[12] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,206 cases) or stipulation (30 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[13] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[14] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

$250.00 to $1,500.00.[15] In one of these cases, the future pain and suffering award was limited by the statutory pain and suffering cap.[16]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In nine cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### 3. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of

---

[15] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[16] *Joyce v. Sec'y of Health & Hum. Servs.*, No. 20-1882V, 2024 WL 1235409, at *2 (Fed. Cl. Spec. Mstr. Feb. 20, 2024) (applying the $250,000.00 statutory cap for actual and future pain and suffering set forth in Section 15(a)(4) before reducing the future award to net present value as required by Section 15(f)(4)(A)); *see Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552, 554-55 (Fed. Cir.1994) (requiring the application of the statutory cap before any projected pain and suffering award is reduced to net present value).

Petitioner's injury. In determining appropriate compensation for pain and suffering, I have carefully reviewed and taken into account the complete record in this case, including, but not limited to: Petitioner's medical records, sworn statements, filings, and all assertions made by the parties in written documents and at the expedited hearing held on February 28, 2025. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases, and relied upon my experience adjudicating these cases. However, my determination is ultimately based upon the specific circumstances of this case.

One factor immediately relevant to my determination is Petitioner's initial treatment delay. Petitioner alleges that her pain was severe immediately, but she did not report her injury to a medical provider until July 2, 2020, and did not seek treatment for her shoulder pain until September 28, 2020 (approximately five months after her April 22, 2020 vaccination). While I find that such a delay is understandable given Petitioner's personal circumstances (and was also not reason to deny entitlement), the delay in seeking treatment is indicative that Petitioner's shoulder pain was not so severe as to necessitate urgent treatment.

Thereafter, Petitioner underwent relatively consistent, albeit fairly conservative, treatment for her generally moderate injury until August 31, 2021, including: six physical therapy sessions,[17] five steroid injections,[18] two PRP injections,[19] and an MRI scan.[20]

Subsequently, there are significant gaps in Petitioner's treatment suggesting she had substantially recovered by August 31, 2021, at 16 months post-vaccination, with some later residual symptoms or flare-ups of her shoulder pain. After a more than seven-month gap in treatment, Petitioner received a sixth and final steroid injection on April 11, 2022, a third and final PRP injection on August 18, 2022, and a final PCP appointment on December 5, 2023 (wherein her shoulder issues were documented, but no treatment was recommended). Ex. 7 at 5; Ex. 19 at 13-14; Ex. 20 at 1; Ex. 22 at 13-14. These later substantial gaps in Petitioner's treatment are a relevant factor in fashioning my award.

---

[17] Petitioner engaged in six physical therapy sessions between March 3, 2021 and April 9, 2021. Ex. 9.

[18] Petitioner received an initial five steroid injections on the following dates: September 28, 2020 (Ex. 7 at 98), January 14, 2021 (Ex. 7 at 77), June 10, 2021 (Ex. 7 at 50), August 27, 2021, (Ex. 7 at 39) and August 31, 2021 (Ex. 7 at 33-34). Petitioner received a sixth and final steroid injection on April 11, 2022 (Ex. 7 at 5).

[19] Petitioner received an initial two PRP injections on March 1, 2021 and August 31, 2021, and a final PRP injection on August 18, 2022. Ex. 20 at 1.

[20] Petitioner's MRI scan occurred on February 8, 2021. The MRI Impression was "a mild tendinopathy and/or a partial tear of the supraspinatus tendon." Ex. 8 at 6.

11

Another factor warranting consideration is the minimal objective evidence that Petitioner manifested reduced range of motion. While I find that Petitioner did eventually demonstrate objective evidence of reduced range of motion, sufficient to establish a Table SIRVA, that evidence is minimal, and clearly this is not an instance in which range of motion limitations added to the injured party's overall suffering.

In making my determination, I have also fully considered Petitioner's sworn statements and those of her husband, a close friend, and her Pilates instructor. Ex. 1; Ex. 15; Ex. 17; Ex. 18. In particular, I acknowledge that Petitioner's injury occurred just before the birth of her daughter and impacted her ability to care for both her newborn daughter and young son. Additionally, I acknowledge that the birth of Petitioner's daughter, and the fact that her injury occurred at the height of the Covid-19 Pandemic impacted her ability to seek immediate treatment for her injury and obtain relief from her pain.

In regard to past SPU reasoned SIRVA decisions, I find the primary case offered by Respondent in support of his proposed $37,500.00 award of pain and suffering to be a poor comparable. *Valdez v Sec'y of Health & Hum. Servs.*, No. 21-394, 2024 WL 1526536 (Fed. Cl. Spec. Mstr. Feb. 28, 2024) (awarding $35,000.00 for pain and suffering). While that claimant also delayed initial treatment for her injury, the onset of Ms. Valdez's injury did not coincide with the birth of a child and the height of Covid-19 Pandemic. Additionally, the duration of Ms. Valdez's injury was significantly shorter at only seven months, and Ms. Valdez underwent far less treatment than Petitioner - she did not engage in physical therapy, receive any steroid or PRP injections, nor did she undergo an MRI unlike Petitioner herein.

However, Respondent offers two other comparables to support his argument "regarding the relevance of relevance of a petitioner promptly seeking treatment (i.e., close-in-time reporting of symptoms) in awarding damages, even when the petitioner was pregnant." ECF No. 29 at 18 (citing *Magee v. Sec'y of Health & Hum. Servs*, No. 18-185V, 2020 WL 5031971, at *1-3, *7-8 (Fed. Cl. Spec. Mstr. Jul. 21, 2020) (awarding $65,000.00 for pain and suffering to a petitioner who was also pregnant at the time of her vaccination) and *Bossenbroek v. Sec'y of Health & Hum. Servs.*, No. 17-122V, 2020 WL 2510454, at *10-11 (Fed. Cl. Spec. Mstr. Apr. 3, 2020) (awarding $50,000.00 for pain and suffering to a petitioner who was a new mom at the time of her vaccination). I find these two cases more reasonable comparables involving petitioners with similar personal factors to the instant Petitioner. And while both petitioners sought treatment more quickly than the instant Petitioner was able, I find both cases on balance represent less severe injuries than that suffered by Petitioner herein with more conservative treatment.

The decisions offered by Petitioner in support of his proposed $95,000.00 award, by contrast, are better comparables to the instant case. ECF No. 27 at 28-31; *Desrosiers v. Sec'y of HHS*, No. 16-224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 in pain and suffering); *Harper v. Sec'y of HHS*, No. 18-202V, 2021 WL 5231980 (Fed. Cl. Spec. Mstr. Oct. 8, 2021) (awarding $92,000.00 in pain and suffering); *Hein v. Sec'y of HHS*, No. 19-1943V, 2021 WL 4805232 (Fed. Cl. Spec. Mstr. Sept. 14, 2021) (awarding $93,000.00 in pain and suffering); *Griffore v. Sec'y of HHS*, No. 19-1914V, 2022 WL 1584682 (Fed. Cl. Spec. Mstr. April 5, 2022) (awarding $65,000.00 in pain and suffering); and *Renchen v. Sec'y of HHS*, No. 20-939V, 2022 WL 3134228 (Fed. Cl. Spec. Mstr. July 5, 2022) (awarding $78,000.00 in pain and suffering). While there are distinguishing factors between the instant case and these cases, all involve petitioners who were pregnant at the time of their vaccinations. But pregnancy at the time of a vaccination is just one of many factors to be considered when determining an appropriate award of pain and suffering and accounts for the variation seen in the above awards based on other factors.

In particular, I find the *Hein* decision represents a good comparable to the instant case, albeit with some distinctions. Ms. Hein attended ten physical therapy sessions, underwent three cortisone injections, two MRIs and 27 months of treatment. Petitioner underwent six physical therapy sessions, six cortisone injections, three PRP injections, and one MRI. However, the fact that Ms. Hein reported her shoulder pain at only 17 days post vaccination – despite being pregnant – does suggest her pain was a little higher at least initially than Petitioner's pain. This factor coupled with the fact that Petitioner's treatment was very minimal (with significant gaps between appointments) after 16 months, and considering that Petitioner did not exhibit a significant range of motion loss, warrants a lower award in the instant case.

Accordingly, **I find that $83,000.00 represents a fair and appropriate amount of compensation for Petitioner's past or actual pain and suffering.**

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $83,000.00 represents a fair and appropriate amount of compensation for Petitioner's in pain and suffering.[21] I also find that Petitioner is entitled to $2,085.00 in past unreimbursable expenses.**

---

[21] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $85,085.00 (representing $83,000.00 for pain and suffering and $2,085.00 in actual unreimbursable expenses) to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[22]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[22] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.